*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0120p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA, *ex rel.* A+
HOMECARE, INC.,

> *Plaintiffs-Appellees,*

*v.*

No. 02-6545

MEDSHARES MANAGEMENT GROUP, INC.; TREVECCA
HOME HEALTH SERVICES, INC.,

> *Defendants,*

STEPHEN H. WINTERS,

> *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 97-01059—William J. Haynes, Jr., District Judge.

Argued: April 23, 2004

Decided and Filed: March 10, 2005

Before: MERRITT and MOORE, Circuit Judges; DUGGAN, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Matthew H. Kirtland, FULBRIGHT & JAWORSKI, Washington, D.C., for Appellant.
Van S. Vincent, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for
Appellees. **ON BRIEF:** Matthew H. Kirtland, FULBRIGHT & JAWORSKI, Washington, D.C.,
for Appellant. Van S. Vincent, ASSISTANT UNITED STATES ATTORNEY, Nashville,
Tennessee, Charles W. McElroy, WHITE & REASOR, Nashville, Tennessee, for Appellees.

---

[*] The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by
designation.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Defendant-Appellant Stephen H. Winters ("Winters") appeals the jury verdict and award of damages in favor of the Plaintiffs-Appellees, the United States ("the Government") and A+ Homecare, Inc. ("A+ Homecare") (collectively "the Appellees").  The jury found Winters liable under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, for including fraudulent pension expenses on two Medicare cost reporting forms and awarded damages of $1,061,138.80.  The district court remitted the award of damages to $602,565.43 to reflect the actual damages incurred by the Government, then trebled the amount to $1,807,696.29, pursuant to 31 U.S.C. § 3729(a).  On appeal, Winters argues that the district court erred by:  (1) excluding evidence regarding Medicare reimbursement of similar pension expenses at other home health agencies Winters owned; (2) denying Winters's motion for summary judgment on Count II of the complaint on the grounds that the deferred compensation accrual on the final cost report was immaterial; (3) failing to consider the merits of Winters's renewed motion for judgment as a matter of law; (4) denying Winters's motion for a new trial on the grounds that (a) the jury verdict was against the clear weight of the evidence; (b) there was no evidence the Government sustained any harm; and (c) the jury was confused in calculating damages.  We conclude that the district court did not err on any of these issues, and thus, the jury verdict and remitted award of damages is **AFFIRMED**.

## I.  BACKGROUND

### A.  Factual Background

In June 1993, Winters purchased Trevecca Home Health Services, Inc. ("THHS"), a home health agency participating in the Medicare program, from A+ Homecare.  Winters owned several other home health agencies in addition to THHS, all of which were managed through Medshares Management Group, Inc. ("MMGI").  Winters served as the President, Chief Executive Officer ("CEO"), and sole member of the board of directors for both MMGI and THHS.  At the time Winters purchased THHS, MMGI had an employees' retirement plan (the "Plan"), which was in place at all of the other home health agencies owned by Winters and managed by MMGI.  The Plan was a deferred profit sharing and stock bonus plan.  It was Winters's policy that after buying a home health agency, he would "immediately implement the complete MMGI package of benefits, including the Plan."  Appellant's Br. at 7.  Upon purchasing THHS in June 1993,

Winters claims that the company adopted the Plan[1] retroactively for the entire 1993 fiscal year.[2]

The MMGI Plan in effect for 1993 permitted THHS to make a yearly pension contribution on behalf of its employees. Winters, as CEO of THHS, had sole discretion not only over whether to make a contribution, but also over the amount and method of calculating such contribution subject to certain maximum limitations. Most importantly, nothing in the Plan required THHS to make a contribution in any fiscal year. *See* J.A. at 1037 (Winters Trial Tr. Vol. I at 132) ("Q: Were you required under the plan to even make that contribution for Trevecca Home Health Services for FY '93? A: No."). Once a contribution had been made to the Plan, it was allocated to THHS employees who participated in the Plan. Employees could participate in the Plan and receive an allocation if they "completed a Year of Service during the Plan Year and are actively employed on the last day of the Plan Year." J.A. at 1208 (MMGI Plan at 26, § 4.3(b)).[3]

Under the Medicare program, qualified home health agencies such as THHS are entitled to reimbursement for the reasonable costs associated with providing medical treatment to those qualified for Medicare benefits. 42 U.S.C. §§ 1395f(a)(2)(C) & (b)(1); 1395x(m)&(o); 1395bbb. The home health agency is reimbursed for its reasonable costs from the Medicare Trust Fund through a fiscal intermediary, which acts as an agent of the Secretary of Health and Human Services ("the Secretary"). The fiscal intermediary reviews claims and makes payments. 42 U.S.C. § 1395u(a). Reasonable costs are defined as "costs actually incurred" and determined in accordance with regulations promulgated by the Secretary. 42 U.S.C. § 1395x(v)(1)(A). The Secretary's

---

[1] It is not clear from the record the date on which THHS formally adopted the MMGI Plan. Pursuant to § 10.1 of the Plan, an affiliated employer can only adopt the Plan "by a properly executed document evidencing said intent and will of such Participating Employer." Joint Appendix ("J.A.") at 1243 (MMGI Plan at 61). Winters submitted a signed copy of the minutes of a THHS board of directors meeting where the board resolved to adopt the MMGI Plan, which was dated June 4, 1993. J.A. at 1278 (THHS Minutes). The record also contains a memorandum, however, written from David Schwab ("Schwab"), corporate counsel of MMGI, to Winters, dated October 6, 1995, which instructs Winters that THHS must adopt the Plan by written agreement. The memorandum further states "[p]lease find attached the adoption agreements for your signature (These have been sent several times consistent with the Legal Department's understanding that the Plan was adopted by the various employers.)." J.A. at 1338 (Mem. from Schwab to Winters). Attached to the 1995 memorandum was an unsigned copy of the THHS board of director minutes dated June 4, 1993. J.A. at 1344 (THHS Unsigned Minutes). At trial, Winters testified that he could not remember the date he signed the minutes. J.A. at 980 (Winters Trial Tr. Vol. I at 75). Schwab testified that he sent the back-dated minutes along with his 1995 memorandum because the MMGI legal department did not have any record of THHS's adoption of the Plan. J.A. at 931 (Schwab Trial Tr. Vol. III at 180). Schwab also admitted that the document he sent along with his 1995 memorandum was identical to the signed THHS minutes which was submitted as evidence of the adoption of the Plan. J.A. at 932 (Schwab Trial Tr. Vol. III at 181).

Furthermore, the minutes approve and adopt "the form of amended Medshares Management Group, Inc. Employees' Retirement Plan and Trust Agreement effective January 1, 1993." J.A. at 1278 (THHS Minutes). The amended Plan which became effective January 1, 1993, however, was only amended by MMGI on December 30, 1993, and therefore, could not have been adopted by THHS on June 4, 1993, six months earlier. J.A. at 1183 (MMGI Plan at 1). Thus, it seems implausible that the Plan was adopted on the date Winters claims.

The Appellees contend that "[o]ther than these minutes, there is no document that purports to adopt the Plan as required by the Plan," and therefore, "[b]ecause the Plan was not adopted by THHS in 1992 or 1993, there was no Plan in place for THHS in either of these years. Thus, no contributions could have been made or claimed for reimbursement for these years." Appellees' Br. at 18.

[2] THHS operates on a fiscal year ending June 30th, while the Plan operates on a calendar year. Winters claims that the adoption of the Plan by THHS on June 4, 1993, allowed for the Plan to be applied retroactively for the entire fiscal year, or from July 1, 1992 to June 30, 1993, despite the fact that Winters purchased THHS only in the last month of the fiscal year.

[3] A Year of Service is defined as twelve consecutive months "during which an Employee has at least 1000 Hours of Service." J.A. at 1196 (MMGI Plan at 14, § 1.52). The Plan Year is defined as twelve months "commencing on January 1st of each year and ending the following December 31st." J.A. at 1194 (MMGI Plan at 12, § 1.39).

regulations provide for "all necessary and proper costs incurred in furnishing [Medicare] services, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans." 42 C.F.R. § 413.9(c)(3). To receive a reimbursement from the Medicare program, a service provider "must provide adequate cost data" to the fiscal intermediary based on "the accrual basis of accounting." 42 C.F.R. § 413.24(a). The fiscal intermediary evaluates the submitted cost reports, verifies the costs incurred in providing Medicare services, and pays out the reimbursement. The claims in this case arise from THHS's claimed pension expense for its employees in the Medicare cost reports submitted to the fiscal intermediary.

### 1. The Interim Rate Report

An Interim Rate Report ("IRR") is a quarterly report filed with the Medicare fiscal intermediary for the reimbursement of real and estimated costs associated with the provision of home health services to Medicare beneficiaries. In August 1993, THHS was required to submit an IRR for the fourth quarter of fiscal year 1993 ("FY93"). In the IRR, THHS was required to report all reimbursable expenses incurred for the entire fiscal year, from July 1, 1992 to June 30, 1993. Because Winters only owned THHS for the last month of FY93, Bertha Holloway ("Holloway"), a cost report consultant working with A+ Homecare, the previous owner, prepared a draft IRR, combining the expenses incurred in the eleven months in which THHS was owned by A+ Homecare with the one month in which Winters owned the company. Holloway's draft IRR did not include any pension contribution to the MMGI Plan.[4] Based on her calculations, Holloway concluded that Medicare had overpaid THHS for its services throughout the year, and thus, THHS was required to repay Medicare $205,466.00. Holloway testified that she informed Allen Ruffin ("Ruffin"), the Chief Financial Officer of MMGI, that based on her calculations THHS had been overpaid. Holloway sent the draft IRR along with the supporting documentation to Ruffin for his review.

On August 27, 1993, Ruffin filed the IRR with Palmetto Government Benefits Administrators ("Palmetto"), a wholly-owned subsidiary of Blue Cross/Blue Shield of South Carolina, and the fiscal intermediary overseeing THHS's Medicare claims. The IRR filed with Palmetto claimed substantially more reimbursable expenses than the draft IRR Holloway had prepared. Specifically, the filed IRR included a pension contribution of $527,019.30 for the THHS employees to the MMGI Plan, of which $520,051.00 was attributable to Medicare.[5] The effect of this additional reimbursable expense was that instead of having to repay Medicare $205,466.00, THHS was to receive approximately $314,585.00. On September 20, 1993, as a result of the filing of the IRR, Palmetto paid THHS $314,585.00 from the Medicare Trust Fund. Within a month, the money was transferred out of the THHS account and into the MMGI general account and used to pay for MMGI's operating expenses, including payroll and accounts payable.

The pension expense which was accrued on the IRR was calculated by taking 15% of the total salary expense of the THHS employees for FY93. In her draft IRR, Holloway calculated the total salary expense for THHS for FY93 as $3,513,462.00. Winters testified that he directed Ruffin to include a pension contribution in the IRR by calculating 15% of Holloway's total salary expense, or $527,019.30. J.A. at 974 (Winters Trial Tr. Vol. I at 69). Fifteen percent of total compensation paid or accrued during the taxable year was the maximum deductible contribution to a profit-sharing plan under the Internal Revenue Code at that time. *See* Economic Growth and Tax Relief

---

[4] Holloway's draft IRR did include an expense of approximately $127,000 for the contribution to A+ Homecare's deferred compensation plan. J.A. at 606 (Holloway Trial Tr. Vol. II at 177). Unlike the $527,019.30 pension expense relating to the MMGI Plan, A+ Homecare had already paid and funded its contribution to the deferred compensation plan.

[5] The difference between the two values relates to pension expenses attributable to services provided to non-Medicare beneficiaries, or parties with private insurance.

Reconciliation Act of 2001, Pub. L. No. 107-16, § 616, 115 Stat. 38, 102 (2001) (amending I.R.C. § 404(a)(3)(A)(i)(I) to increase the deduction limit from 15% to 25%). Winters testified that the 15% figure was the standard amount he used at all of his home health agencies. J.A. at 974 (Winters Trial Tr. Vol. I at 69). The salary expense upon which Winters based his calculation, however, did not reflect THHS's employment level at the time of purchase.

Holloway testified at trial that for most of 1992 A+ Homecare owned only THHS. In December 1992 and spring of 1993, A+ Homecare purchased two more home health agencies. Holloway explained that prior to the purchase of these two additional agencies, all of the expenses incurred by A+ Homecare were reported as part of THHS because A+ Homecare did not meet the definition of a home office under the Medicare guidelines. After the purchase of additional agencies, however, A+ Homecare met the definition of a home office and reported its costs as a separate entity. Moreover, Holloway testified that after the acquisitions, several branches in the Nashville area that were a part of THHS were transferred to one of the newly acquired home health agencies. J.A. at 599 (Holloway Trial Tr. Vol. II at 170). The net effect of these moves was to decrease significantly the number of employees at THHS, from approximately four hundred in the beginning of 1993 to fifty-seven by June 1993. Holloway further testified that she met with Winters "to make sure that Mr. Winters understood the number of branches that were part of [THHS] at the time that he was contemplating purchasing [THHS]." J.A. at 598 (Holloway Trial Tr. Vol. II at 169). She explained that "[t]he crux of my conversation with Mr. Winters was to make sure he understood that the visits would decrease and that some of the branches that have been reporting under [THHS] would no longer be reporting." J.A. at 600 (Holloway Trial Tr. Vol. II at 171). Winters testified that he was aware that THHS had approximately fifty-seven employees at the time he purchased the company. J.A. at 968 (Winters Trial Tr. Vol. I at 63). Despite this knowledge, he instructed Ruffin to use THHS's total compensation expense for FY93 to calculate the pension contribution for THHS employees to the MMGI Plan. Thus, THHS reported on its IRR to Palmetto a pension expense of $527,019.30 for its fifty-seven employees, of which $520,051.00 was attributable to Medicare. The result was an offset of $205,466.00, which THHS did not have to repay, and a payment from Medicare of $314,585.00.

## 2. The Final Cost Report

THHS was required to submit its Final Cost Report ("the Cost Report") for FY93 within ninety days of the close of its fiscal year, or by September 30, 1993. The Cost Report, which is the finalized version of the previously filed IRR, must include all the costs incurred during THHS's entire fiscal year, supported by accompanying documentation. Accordingly, THHS began efforts to accumulate documentation for the eleven months of FY93 when A+ Homecare owned THHS. THHS encountered severe difficulties in obtaining information from A+ Homecare about the months in question, and as a result, the Cost Report was not filed until October 1995, two years after the deadline.[6]

In order to finalize the pension contribution for FY93, Winters began discussions with Frank Carney ("Carney"), MMGI's outside pension attorney, about the size of a contribution that could be made to the Plan for FY93. At issue was how to calculate the contribution. Though THHS operated on a fiscal year ending June 30, the Plan operated on a calendar year. Thus, because THHS's FY93 began on July 1, 1992 and ended on June 30, 1993, it straddled two different Plan years — 1992 and 1993. It appears from the record that Carney initially advised Winters that a contribution could be made for the employees in FY93 only in Plan year 1993, or retroactive only

---

[6]Winters sued A+ Homecare in Tennessee state court for its failure to produce information for the eleven months it owned THHS in FY93. The state court issued an order compelling A+ Homecare to disclose THHS financial information to Winters. While the record in this case is not clear on this point, it seems that Winters continued to encounter significant difficulty in obtaining financial information from A+ Homecare over the next two years.

to January 1, 1993. J.A. at 1263 (Fletcher Notes from Apr. 25, 1995 mtg.). Carney later altered his opinion and advised Winters that "[t]he only calendar year available at [THHS]'s corporate year end was the year ending December 31, 1992. For that reason, [THHS] must make its contribution for its fiscal year ending June 30, 1993 based upon compensation as of the calendar year commencing January 1, 1992 and ending December 31, 1992."[7] J.A. at 1343 (Ltr. from Carney to Winters). Relying upon Carney's advice, Winters directed his staff to calculate the compensation expense for THHS for calendar year 1992 to determine the pension contribution for FY93.

The problem which arose for Winters in calculating the pension contribution is the absence of financial information for THHS during this period. Winters never owned THHS during calendar year 1992, and therefore, needed to rely entirely upon financial information from the two companies which owned THHS during that time: A+ Homecare and Healthcare of America Inc. ("HCA"). When A+ Homecare owned THHS, it filed a single tax return which included the THHS expenses as well as the home office expenses of A+ Homecare as well as several other home health branches which were not part of THHS by June 1993. HCA, which owned THHS during the first half of 1992, reported THHS's expenses on HCA's tax return, which also included several additional home health agencies as well. Carney advised Winters in 1993 against making a pension contribution in FY93 because "there was no information available to determine who are eligible and ineligible employees, so you cannot make that calculation to know what to contribute to the plan." J.A. at 363 (Carney Trial Tr. Vol. III at 225). In 1995, Carney advised Winters that "[t]here was no way to fund it because we could not calculate the funding. So my advice to him is you can't fund it until you calculate what you put into it." J.A. at 363 (Carney Trial Tr. Vol. III at 225).

Winters rejected Carney's advice, however, and instructed Bruce Hayden ("Hayden"), an internal auditor with MMGI, to reconstruct the calendar year 1992 compensation expense for THHS based on state unemployment tax information for A+ Homecare and HCA.[8] After compiling the tax information, Hayden created two schedules: the first was the compensation expense for all HCA employees for calendar year 1992 added to the compensation expense for A+ Homecare's employees for just the second half of 1992; the second schedule included the 1992 compensation expense only for those employees of HCA and A+ Homecare who were still working at THHS in the first quarter of 1993. J.A. at 1288-89 (Mem. from Hayden to Winters). The second schedule was created in light of the Plan's requirements that an eligible employee must work for a year and be employed on the last day of the Plan year to participate in the allocation of the contribution. The first schedule listed 397 employees, while the second listed 130.

Both schedules contained obvious shortcomings. Most noticeably, there was no way to determine if the employees were actually working for THHS or instead for one of the other home

---

[7] It should be noted that Carney's opinion was premised on the fact that THHS had adopted the Plan by written agreement prior to the end of its fiscal year on June 30, 1993. J.A. at 1341 (Ltr. from Carney to Winters). As was mentioned above, there is substantial evidence in the record to support the contention that the Plan was not formally adopted until October 6, 1995. *See supra* note 1. Therefore, THHS could not make a contribution to the Plan in FY93. Moreover, the minutes for the board of directors meeting at which THHS purportedly adopted the Plan state that the version of the Plan adopted is the amended one which became effective January 1, 1993. J.A. at 1278 (THHS Minutes). Therefore, THHS was not an affiliated employer in the prior version of the Plan and could not make a contribution to the Plan for calendar year 1992.

[8] According to Winters's Brief, "[t]his information was used because [Winters was] advised by a current officer of HCA, Dean Alverson, that during calendar year 1992 all HCA employees in fact had worked for THHS." Appellant's Br. at 13; J.A. at 1034 (Winters Trial Tr. Vol. I at 129).

health agencies or branches owned by HCA or A+ Homecare or for their respective home offices.[9] Hayden testified at trial that he told Winters "we couldn't confirm which employees were from which company." J.A. at 556 (Hayden Trial Tr. Vol. III at 131). Hayden also informed Winters that "[he] had no way to determine whether anyone worked 1,000 hours and met this 1,000 hour working requirement. [He] did not have any information that would definitely ascertain whether someone met the end of the year working requirement." J.A. at 555 (Hayden Trial Tr. Vol. III at 130). Nevertheless, Winters instructed Hayden to use the larger number in the Cost Report.

Based on Hayden's calculations in the first schedule, THHS had a compensation expense of $4,139,682.61 in calendar year 1992. Calculating the pension contribution as 15% of that value, THHS reported a pension contribution of $620,952.39 in the Cost Report, of which $602,565.43 was attributable to Medicare.[10] The pension contribution figure, $602,565.43, was a significant increase over the $520,051.00 figure reported in the IRR. After the higher pension contribution was added to the rest of the expenses on the Cost Report, THHS owed Medicare $71,839.00. On October 4, 1995, after signing and certifying its contents, Winters filed THHS's Cost Report for FY93 with Palmetto. In the Cost Report Questionnaire, Winters stated that "Due to the unusual and extenuating circumstances described in enclosed correspondence, the Provider has been unable to calculate the exact funding requirement necessary. The Provider has included its best estimate of the funding requirement in allowable costs." J.A. at 1247 (Addendum to Cost Report Questionnaire, question F(3)). In a letter which accompanied the Cost Report, Hayden wrote that the accrual for pension expense "was calculated based upon 'best available information' as of 5:00 p.m., Wednesday, October 4, 1995." J.A. at 1405 (Ltr. from Hayden to Peebles).

Upon review of THHS's Cost Report for FY93, Palmetto disallowed the pension expense because the Plan was not funded within one year after the expense was accrued as required by Medicare regulations. Put another way, THHS had failed to make a contribution to the Plan on behalf of its employees within one year of accruing the expense in FY93. In the Cost Report, Winters explained that the Plan was not funded during the one year period "due to extenuating circumstances" and therefore, requested a three-year extension. J.A. at 1247 (Addendum to Cost Report Questionnaire, question F(3)). Palmetto refused, and the pension expense was disallowed.

## B. Procedural History

On October 16, 1997, A+ Homecare, the relator, brought a qui tam action against MMGI, THHS, and Winters (collectively, "the Defendants") in the United States District Court for the Middle District of Tennessee for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. The United States later intervened and adopted the complaint without amendment. Count I of the complaint alleged that the Defendants knowingly included a false pension expense of $527,019.30 in the fourth quarter IRR and presented it to the Government "for payment or approval" or "to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."[11] 31 U.S.C. § 3729(a)(1) & (7). Count II alleged that the Defendants violated the

---

[9] Carney testified that had he been told "that they were employees that did not provide services for [THHS] and, therefore, were not [THHS] employees, [he] would not have said that they be included in the computation included with [THHS]." J.A. at 354 (Carney Trial Tr. Vol. III at 216).

[10] The difference between the two values relates to pension expenses attributable to services provided to non-Medicare beneficiaries, or parties with private insurance. J.A. at 757 (Menke Trial Tr. Vol. II at 69).

[11] The complaint incorporated both types of claims actionable under the FCA. A standard false claim is an attempt to receive payment from the Government for false or fraudulent claims. 31 U.S.C. § 3729(a)(1). A reverse false claim is an attempt in order to "conceal, avoid, or decrease" an obligation owed to the Government by filing false documents. 31 U.S.C. § 3729(a)(7).

FCA by knowingly including a false pension expense of $620,952.39 in the final Cost Report. Count III alleged that the Defendants violated the FCA by providing false information to Palmetto during the audit of THHS's Cost Report. Because THHS and MMGI declared bankruptcy, the district court stayed the case as against those two parties, but allowed the suit to continue against Winters.

On January 16, 2001, Winters filed a motion for summary judgment as to all counts. The district court granted the motion as to Count III, but denied it as to the other two. A trial ensued, and the jury found Winters liable on Counts I and II and awarded damages in the amount of $1,061,138.80. Pursuant to the Government's request, the district court remitted the jury award to $602,565.43, which was then trebled to $1,807,696.29 pursuant to the FCA. On September 13, 2002, the district court denied Winters's motion for a new trial and, in the alternative, for judgment as matter of law. Winters then filed a timely notice of appeal.

## II. ANALYSIS

### A.  Exclusion of Evidence

Winters's first argument on appeal is that the district court committed reversible error in excluding evidence regarding Palmetto's reimbursement of pension contributions to the MMGI Plan at Winters's other home health agencies. "Decisions regarding the admission and exclusion of evidence are within the peculiar province of the district court and are not to be disturbed on appeal absent an abuse of discretion." *United States v. Middleton*, 246 F.3d 825, 838 (6th Cir. 2001); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). Moreover, we will reverse a district court's ruling only "when such abuse of discretion has caused more than harmless error" such that this court "lacks a fair assurance that the outcome of a trial was not affected by evidentiary error." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005) (internal quotations omitted). Applying this standard to the facts of this case, we conclude that the district court did not abuse its discretion in excluding testimony regarding Medicare reimbursement for pension expenses at Winters's other home health agencies.

At trial, Winters sought to introduce this evidence to support his argument that the pension accruals for THHS were consistent with past practice and were included in the cost reports in good faith. The district court excluded any evidence of pension reimbursements at Winters's other home health agencies pursuant to the Government's motion in limine. The Government had filed its motion in response to the court's earlier ruling, resulting from Winters's objection, which limited discovery solely to pension issues at THHS. Winters was permitted, however, to present evidence as to "testimony of any policy of the Palmetto auditors." J.A. at 89 (Dist. Ct. Order Feb. 23, 2001). Thus, the district court permitted Winters to introduce evidence that 15% of total compensation expense was consistent with Medicare regulations, but prohibited him from presenting evidence as to specific reimbursements for pension expenses at Winters's other home health agencies. The district court explained to the parties that Winters "can ask if there is a policy on the use of 15 percent. But I'm not going to allow you to ask whether there is a policy that has been applied to any other company, because the government hasn't had an opportunity to discover that." J.A. at 1097 (Trial Tr. Vol. II at 8).

After careful review of the record, we conclude that the district court did not abuse its discretion but rather adopted a reasonable response. During discovery, the Government sought to compel Winters to turn over information regarding the pension contributions to the MMGI Plan at his other agencies "to see if they handled other entities the same way. Did they make the calculations the same way, did they determine how to fund the plan the same way between the entities." J.A. at 146 (Tr. of Mot. to Compel Hr'g at 70). Despite the fact that the Government was not permitted to discover this information, Winters argues in his appellate brief that this evidence

should have been included at trial to demonstrate "that [he] accrued pension expense on the IRR and Cost Report in exactly the same way that had previously been audited and approved by Palmetto in prior years for the same MMGI Plan." Appellant's Br. at 24. The district court correctly held that Winters should not benefit from using evidence from which the Government had been excluded. To allow otherwise would permit a litigant to manipulate discovery rules and use a favorable discovery limitation as a sword rather than a shield. *See, e.g.*, *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 307 (6th Cir. 2002) (concluding that a party cannot selectively waive the work-product doctrine to prejudice his opponent), *cert. denied*, 539 U.S. 977 (2003); *Frontier Ref. Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 704 (10th Cir. 1998) (holding that a litigant cannot "selectively [use] the privileged documents to prove a point but then [invoke] the privilege to prevent an opponent from challenging the assertion").

Moreover, the district court's ruling, even if erroneous, would not have altered the outcome of the trial. Winters was permitted to present evidence that the pension accrual for THHS was consistent with his policy at his other agencies. *See* J.A. at 974 (Winters Trial Tr. Vol. I at 69) ("Q: And who made the determination that 15 percent of the wages would be utilized based on the salaries on the interim rate report? A: I did. That was the standard amount that we used on all of the agencies."). The admission of evidence that Palmetto reimbursed those agencies for the pension contributions to the MMGI Plan does not shed light on the underlying allegations of fraud. Specifically, that Winters might have accrued pension expenses correctly at other agencies is not probative of whether at THHS he accrued pension expenses for employees that did not work there, during a time in which he did not own it, and for a plan that had not yet been adopted. Therefore, we conclude the district court did not abuse its discretion in excluding this evidence.

## B.  Denial of Motion for Summary Judgment on Count II

The second issue Winters raises on appeal is that the district court erred when it denied his motion for summary judgment on Count II on the grounds that the pension expense on the Cost Report was immaterial because Palmetto disallowed it. Winters argues that "materiality is [a] prerequisite to a finding of liability under section (a)(7) of the FCA," and therefore, he should have been entitled to summary judgment on Count II. Appellant's Br. at 26. We have previously held that "where summary judgment is denied and the movant subsequently loses after a full trial on the merits, the denial of summary judgment may not be appealed." *Jarrett v. Epperly*, 896 F.2d 1013, 1016 (6th Cir. 1990); *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 537 (6th Cir. 2003). We explained that:

> The policy behind this rule is based on the conclusion that the potential injustice of allowing the improper denial of a motion for summary judgment is outweighed by the injustice of depriv[ing] a party of a jury verdict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial.

*Paschal v. Flagstar Bank, FSB*, 295 F.3d 565, 571-72 (6th Cir. 2002), *cert. denied*, 537 U.S. 1227 (2003) (alteration in original) (internal quotation omitted). We have noted, however, that where the denial of summary judgment was based on a question of law rather than the presence of material disputed facts, the interests underlying the rule are not implicated. *Id.* at 572. Moreover, even though the movant failed to raise the issue in a Rule 50(b) motion after the adverse jury verdict, appellate review is not waived "if an appeal of the denial of a motion [for] summary judgment on the same ground would involve review of a pure question of law." *Id.* In this case, the district court concluded "the inclusion of the pension expense in the cost report is material as a matter of law." J.A. at 85 (Dist. Ct. Summ. J. Mem. at 37). Therefore, because the issue of materiality "does not

require the resolution of any disputed facts," we will review the denial of Winters's motion for summary judgment on Count II. *Paschal*, 295 F.3d at 572.

### 1. Materiality Requirement

While we have yet to address the issue, several courts of appeals have suggested that a civil claim brought under the FCA includes a materiality requirement. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 679 (5th Cir. 2003) (en banc) (Jones, J. concurring); *United States ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883, 887 (8th Cir.), *cert. denied*, 540 U.S. 875 (2003) [hereinafter "*Costner II*"]; *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir.), *cert. denied*, 528 U.S. 1038 (1999); *United States ex rel. Berge v. Bd. of Tr.*, 104 F.3d 1453, 1459 (4th Cir.), *cert. denied*, 522 U.S. 916 (1997); *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 298 (D.C. Cir. 1994). Though a materiality element is not expressly included in the FCA, these courts have found implicit support for a materiality element in the statutory language, the legislative history, and the underlying purpose of the law.

In *United States v. Wells*, 519 U.S. 482, 490-92 (1997), the Supreme Court established a three-step framework by which courts should interpret statutes: first, a natural reading of the full text; second, the common-law meaning of the statutory terms; and finally, consideration of the statutory and legislative history for guidance. Utilizing this framework in *Wells*, the Court concluded that the federal crime of knowingly making a false statement to a federally insured bank, 18 U.S.C. § 1014, does not include a materiality element. *Id.* at 484. The Court's conclusion rested on the absence of the term "materiality" in the statute, the lack of a settled meaning of "false statement" at common law, and support for this interpretation in the statutory history. *Id.* at 490-92. By contrast, in *Neder v. United States*, 527 U.S. 1, 20 (1999), the Court applied the *Wells* framework and concluded that the federal crimes of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and bank fraud, 18 U.S.C. § 1344, include a materiality requirement. Though the statutes in question similarly fail to mention the word "materiality," the Court concluded that by using the term "fraud," Congress intended to incorporate the "well-settled meaning at common law," which included proof of materiality. *Id.* at 21-23. The Court reasoned that "under the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses, we cannot infer from the absence of an express reference to materiality that Congress intended to drop that element from the fraud statutes." *Id.* at 23. Thus, the Court concluded "we must *presume* that Congress intended to incorporate materiality unless the statute otherwise dictates." *Id.* (emphasis in original) (internal quotation omitted).

Applying the *Wells* framework to the FCA, we conclude that false statements or conduct must be material to the false or fraudulent claim to hold a person civilly liable under the FCA. First, similar to the statutes at issue in *Wells* and *Neder*, the FCA does not mention the word materiality. A natural reading of the statutory text, however, supports the implication of a materiality element. Under the first subsection, the FCA imposes liability on "[a]ny person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The term "false or fraudulent" modifies the word "claim," which is defined as "any request or demand . . . for money or property . . . [where] the United States Government provides any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Thus, liability does not arise merely because a false statement is included within a claim, but rather the claim itself must be false or fraudulent. A false statement within a claim can only serve to make the entire claim itself fraudulent if that statement is material to the request or demand for money or property. *United States ex rel. Wilkins v. N. Am. Constr. Corp.*, 173 F. Supp. 2d 601, 624 (S.D. Tex. 2001). Furthermore, subsection two imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement to *get* a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (emphasis added). Once again, liability attaches only where the claim itself is false or

fraudulent and the false record or statement is being used "to get" that false claim paid. Put another way, a false statement or record within a true claim is not actionable under the FCA. As the Fifth Circuit has stated, "[t]he express connection of a false statement with 'getting' a false claim paid is tantamount to requiring that the false statement be material to the payment decision." *Southland Mgmt. Corp.*, 326 F.3d at 679 (Jones, J. concurring). Lastly, subsection seven imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). This section, which addresses reverse false claims, does not mention the word "claim," but nonetheless requires that the false record or statement be used for fraudulent purposes. Thus, once again, liability does not arise from merely making a false statement, but rather from making a false statement to conceal, avoid, or decrease an obligation owed to the Government. A false statement can only avoid or decrease an obligation if that statement is material to the money or property owed to the Government. In sum, we conclude that a natural reading of the text of all three of these statutory provisions supports the implication that the FCA imposes liability only for false statements or conduct which are material to a false or fraudulent claim for money or property from the Government.

The second step in the *Wells* framework is to interpret the statute in light of the common-law meaning of the statutory terms, specifically the words "false" and "fraudulent" that modify the word "claim." The Supreme Court has held that "the common law could not have conceived of 'fraud' without proof of materiality." *Neder*, 527 U.S. at 22. After an exhaustive historical analysis of the common law usages of the terms "false" and "false claim," the *Wilkins* court noted that nothing about their common-law meanings precludes a materiality requirement. 173 F. Supp. 2d at 626. Thus, by using the term "false or fraudulent" to modify the word "claim," Congress intended to incorporate the well-settled meaning of common-law fraud, including a materiality element. By contrast, the Third Circuit has noted that the Supreme Court's holding in *Wells* that the term "false statement" does not imply a materiality requirement "perhaps . . . argues against [a requirement]" in the FCA. *United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 415 (3d Cir. 1999) (citing *Neder*, 527 U.S. at 23 n.7), *cert. denied*, 531 U.S. 880 (2000). That reasoning, however, fails to account for the use of the term in the statute. Unlike the statute in *Wells*, which criminalizes the act of "knowingly making a false statement," 18 U.S.C. § 1014, the FCA requires that the false statement be used "to get a false or fraudulent claim paid." 31 U.S.C. § 3729(a)(2). As we stated above, liability is imposed based on the use of the false statement in relation to the fraudulent claim, rather than simply because a false statement was made. Similarly, subsection seven imposes liability based on the use of the false statement to decrease or avoid an obligation to the Government. 31 U.S.C. § 3729(a)(7). Thus, we conclude that the common-law definitions of the terms "false" and "fraudulent" are consistent with including materiality as an element of the FCA.

The final step in the *Wells* framework is to consider the materiality requirement in light of the statutory and legislative history of the FCA. The history of the FCA reveals that the principal goal underlying the statute is to prevent fraud perpetrated on the Government. The original False Claims Act was enacted in 1863 "to combat rampant fraud in Civil War defense contracts." S. Rep. No. 99-345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273. In 1986, Congress amended the civil FCA "to enhance the Government's ability to recover losses sustained as a result of fraud against the Government." *Id.* at 1, 1986 U.S.C.C.A.N. at 5266. Congress noted that the "growing pervasiveness of fraud necessitates modernization of the Government's primary litigative tool." *Id.* at 2, 1986 U.S.C.C.A.N. at 5266. Thus, the scope of the FCA was expanded through such changes as eliminating the showing of specific intent to defraud, raising the civil penalties, increasing the Government's award to treble damages, and imposing liability for a reverse false claim. *Id.* at 17-18, 20, 1986 U.S.C.C.A.N. at 5282-83, 5285. With regards to a reverse false claim, the Senate report states that the FCA was amended "to provide that an individual who makes a *material misrepresentation* to avoid paying money owed the Government would be equally liable under the Act as if he had submitted a false claim to receive money." *Id.* at 18, 1986 U.S.C.C.A.N. at 5283

(emphasis added). Thus, Congress emphasized that only those false statements which are *material* to the fraudulent claim itself are actionable under the FCA. The prevention of *nonmaterial* false claims is not addressed anywhere in the Senate report. Therefore, we conclude that the statutory and legislative history supports the conclusion that materiality is implicitly an element of liability under the FCA.

In sum, after reviewing the natural reading of the text, the common-law meaning of the statutory terms, and the statutory and legislative history, we conclude that the FCA imposes liability only for false statements or conduct which are material to a false or fraudulent claim to receive money or property from the Government or reduce an obligation owed to it.[12]

## 2. Materiality Standard

Having determined that the FCA does include a materiality requirement, we turn to the appropriate standard by which materiality should be reviewed. The circuits which have addressed the issue of materiality are inconsistent on the standard to be used. *See Costner II*, 317 F.3d at 886 (noting that "the existence of and appropriate standard for a materiality element is a matter of some disagreement in the courts"). The United States Supreme Court has stated that "[i]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder*, 527 U.S. at 16 (internal quotation omitted). The Fourth Circuit has adopted the "natural tendency" test in the civil FCA context and concluded that a university's failure to credit a graduate student's research in a grant application was not material to the NIH's decision to renew the university's research grant. *Berge*, 104 F.3d at 1460-61. By contrast, the Eighth Circuit has adopted a more stringent "outcome materiality" test, which requires a showing that the alleged fraudulent actions had "the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due." *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998) [hereinafter "*Costner I*"]. Applying the "outcome materiality" test, the Eighth Circuit held that where the plaintiff cannot show that the government agency would have acted differently had it known of the omission, "there is no false claim because [the agency's action] would have occurred regardless of [the defendant's] actions." *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 563 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998).

---

[12]Our holding in this case is not controlled by our previous decision in *United States v. Nash*, 175 F.3d 429, 434 (6th Cir.), *cert. denied*, 528 U.S. 888 (1999), in which we held that materiality is not an element under the criminal false-claims provision, 18 U.S.C. § 287. Though they were both part of the original False Claims Act passed in 1863, the civil and criminal provisions were severed in 1874 and codified in different portions of the United States Code. *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 674 (5th Cir.), *reh'g en banc granted*, 307 F.3d 352 (5th Cir. 2002). While we have compared the two provisions in the past to interpret statutory language, *see United States v. McBride*, 362 F.3d 360, 371 (6th Cir. 2004) (utilizing § 3729(c) to define the term "claim" in § 287), comparison of the two statutes in this case would be unhelpful. With regard to materiality, the language of the civil provision is substantially different than its criminal counterpart. *Compare* § 3729 (imposing civil liability on any person who "knowingly presents . . . a false or fraudulent claim for payment or approval" or who uses a false statement "to get a false or fraudulent claim paid") *with* § 287 (imposing criminal liability on any person who presents a claim "knowing such claim to be false, fictitious, or fraudulent"). We have explained that § 287 criminalizes false statements similar to the statute at issue in *Wells*. *Nash*, 175 F.3d at 434. Thus, the mere inclusion of a false statement in a claim is sufficient to give rise to criminal liability under § 287. By contrast, § 3729 was "intended to reach all fraudulent attempts to cause the Government to pay our [sic] sums of money or to deliver property or services," rather than just mere false statements. S. Rep. No. 99-345, at 9, 1986 U.S.C.C.A.N. at 5274. As we stated above, a false statement within a claim can only serve to make the entire claim itself fraudulent if that statement is material to causing the Government to pay the fraudulent claim.

Therefore, our previous decision in *Nash* does not control the outcome of our decision in this case. *Compare Southland Mgmt. Corp.*, 326 F.3d at 679 (Jones, J. concurring) (noting that "there should no longer be any doubt that materiality is an element of a civil False Claims Act") *with United States v. Upton*, 91 F.3d 677, 685 (5th Cir. 1996) (holding that materiality is not an element for criminal liability under § 287), *cert. denied*, 520 U.S. 1228 (1997).

Upon review of these two different standards, we conclude that the "natural tendency" test is the appropriate standard by which materiality in the FCA civil context should be measured. This standard "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003). Such a standard is more consistent with the plain meaning of the statute, which attaches liability upon *presentment* of a false or fraudulent claim, rather than *actual payment* on that claim. 31 U.S.C. § 3729(a)(1). Similarly, a reverse false claim may be brought if a party "knowingly makes . . . a false record or statement to conceal, avoid, or decrease an obligation" owed to the Government. 31 U.S.C. § 3729(a)(7). The language of this section requires the intent to conceal, but is silent on the result. Moreover, liability under the FCA is punishable by a civil penalty in addition to any damages which the Government actually sustains, which reinforces the conclusion that the actual result is not dispositive of liability under the FCA.

Furthermore, evaluating materiality based on the potential effect rather than actual result is more consistent with the underlying purpose of the FCA. The United States Supreme Court has broadly interpreted the statute to cover "all fraudulent *attempts* to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968) (emphasis added). We have similarly held that "recovery under the FCA is not dependent upon the government's sustaining monetary damages." *Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 429 (6th Cir. 2001). These holdings are consistent with the FCA's principal goal of ensuring the integrity of the Government's dealings, which is embodied in "the maxim that [m]en must turn square corners when they deal with the Government." *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6th Cir. 1998) (internal citation omitted) (alteration in original). Therefore, we hold that the "natural tendency" test is the appropriate standard by which materiality should be reviewed.

### 3. The Cost Report Claim

Having established that the FCA does include a materiality requirement and that the "natural tendency" test is the appropriate standard by which it should be adjudged, we turn to the facts of this case. Whether the pension accrual on the Cost Report is material is a mixed question of law and fact, *Harrison*, 352 F.3d at 914, which we review de novo. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 355 F.3d 574, 589 (6th Cir. 2004). Applying the "natural tendency" test to this case, we conclude that the pension accrual on the Cost Report was material even though it was disallowed by Palmetto. Palmetto disallowed the pension expense because it was not funded within one year of the date on which it was accrued. Even though it may not have resulted in an actual decrease in the obligation owed to Medicare,[13] Winters's action of placing the accrual on the Cost Report certainly had the "natural tendency to influence or [was] capable of influencing the government's funding decision." *Harrison*, 352 F.3d at 917. The record reveals Winters's belief that the accrual could influence agency action. Along with the Cost Report, Winters sent three letters, two written personally by him, which offer justifications for why the pension had yet to be funded. In the questionnaire, Winters wrote that the pension had yet to be funded "[d]ue to . . . extenuating circumstances" and that he believed "this issue qualifies for an extension to the one year liquidation requirement and should be allowable if liquidated within the three year liquidation period." J.A. at 1247 (Addendum to Cost Report Questionnaire, question F(3)). The clear purpose of these letters and the explanation contained in the questionnaire was to persuade Palmetto to allow the pension accrual even though the pension had not been funded timely.

---

[13] In this case, the pension accrual in the Cost Report did in fact result in a decrease in the obligation owed to Medicare. Though it disallowed the expense, Palmetto never issued a notice of provider reimbursement, and thus Winters never repaid Medicare the pension accrual of $602,565.43. *See infra* Part D.2. The issuance of the notice of provider reimbursement is irrelevant in this case, however, because the mere act of placing the false accrual on the Cost Report is sufficient to find Winters liable under the FCA.

Winters argues in his brief that the pension accrual was included in the Cost Report to induce Palmetto not to reduce THHS's obligation to Medicare, but rather to perform an audit. Appellant's Br. at 34. In support of his argument, he cites to the questionnaire response which states that the pension would be funded "once the exact funding requirement is determined through the Intermediary audit process." J.A. at 1247 (Addendum to Cost Report Questionnaire, question F(3)). We find Winters's argument to be wholly unpersuasive. Medicare regulations "require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program." 42 C.F.R. § 413.20(a). Moreover, the cost reports submitted to the intermediaries "must provide adequate cost data . . . capable of verification by qualified auditors." 42 C.F.R. § 413.24(a). The role of the fiscal intermediary is only to ensure compliance with Medicare regulations. Thus, the responsibility is on Winters and THHS to calculate a discretionary pension contribution, not on Palmetto to determine it for them. A party cannot file a knowingly false claim on the assumption that the fiscal intermediary will correctly calculate the value in the review process. *See, e.g.*, *United States ex rel. Sarasola v. Aetna Life Ins. Co.*, 319 F.3d 1292, 1301 (11th Cir. 2003) (holding that a fiscal intermediary is immune from liability for approving payment for allegedly fraudulent claims). Such a result would shift the burden of cost calculation from the provider to the fiscal intermediary and encourage the filing of false claims, which is directly at odds with the stated goal of the FCA.

In sum, we conclude the pension accrual on the Cost Report was capable of influencing the Government's funding decision and therefore satisfies the materiality requirement. Thus, we affirm the district court's denial of summary judgment in favor of Winters on Count II.

## C. Denial of Motion for Judgment as a Matter of Law

Winters's third argument on appeal is that the district court erred by failing to consider the merits of his renewed motion for judgment as a matter of law. The district court ruled that Winters waived his right to file a renewed motion because he failed to make a motion for a judgment as a matter of law at the close of all the evidence. We have held that "[t]he question of waiver is a mixed question of law and fact," and thus, "[w]e review any determination of underlying facts under the clearly erroneous standard of review, and make a *de novo* determination of whether those facts constitute legal waiver." *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 426 (6th Cir. 2004). Applying this standard, we conclude that the district court did not err in finding that Winters waived his right to file a renewed motion for judgment as a matter of law following the jury verdict.

"It is well-settled that a court can only consider a motion for a judgment notwithstanding the verdict *only if* the moving party has previously made a motion for a directed verdict at the close of all the evidence."[14] *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1522 (6th Cir. 1990) (emphasis in original). We have "ruled, however, that technical deviation from Rule 50(b)'s command is not fatal." *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 477 (6th Cir.), *cert. denied*, 498 U.S. 855 (1990). Instead, we noted that "[t]he application of Rule 50(b) in any case should be examined in the light of the accomplishment of [its] particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for the truth." *Boynton v. TRW, Inc.*, 858 F.2d 1178, 1185 (6th Cir. 1988) (internal quotation omitted) (alteration in original). Therefore, in order to avoid "adherence to slavish nominalism" we stated that:

> a motion for judgment notwithstanding may be granted despite the party's failure to renew his motion for a directed verdict where: (1) The court indicated that the

---

[14] We have explained that "[a]lthough Federal Rule of Civil Procedure 50 was amended in 1991 to establish 'judgment as a matter of law' as a uniform term replacing the use of 'j.n.o.v.' and 'directed verdict,' it is clear that this amendment did not change the rule stated in *Portage II*." *Jackson v. City of Cookeville*, 31 F.3d 1354, 1357 (6th Cir. 1994).

> renewal of the motion would not be necessary to preserve the party's rights; and
> (2) The evidence following the party's unrenewed motion for a directed verdict was
> brief and inconsequential.

*Riverview*, 899 F.2d at 477 (quoting 5A James Wm. Moore et al., Moore's Federal Practice § 50.08 (2d ed. 1984)).  In *Boynton*, the defendant moved for a directed verdict at the end of the plaintiff's case-in-chief and after the jury verdict, but neglected to do so at the close of all the evidence.  The district court did not rule on the directed verdict motion at the end of the plaintiff's case, but rather took it "under advisement and indicated its firm intent to 'get the case to the jury.'"  *Boynton*, 858 F.2d at 1186.  In addition, the defendant's evidence in its case-in-chief consisted of one person, whose testimony "was brief and largely cumulative."  *Id.*  Therefore, we concluded that "no logical purpose would be served by holding that the district court was precluded from entertaining [the defendant]'s motion for a judgment n.o.v."  *Id.*  Similarly, in *Riverview*, the district court informed the defendants that renewal of their directed verdict motion was unnecessary, and the rebuttal evidence presented after their directed verdict motion was brief.  *Riverview*, 899 F.2d at 478.

By contrast, in *Jackson v. Huron Development Ltd. Partnership*, No. 98-2356, 2000 WL 282482, at *3 (6th Cir. Mar. 9, 2000),[15] we distinguished *Boynton* and concluded that the defendant could not take advantage of the *Riverview* exception so as to excuse its failure to renew its motion at the close of all of the evidence.  In *Jackson*, "the trial court did not take the defendants' motion under advisement or otherwise indicate that it need not be renewed," but rather explicitly denied it.  *Id.*  Following the denial of the motion, the defendants' case-in-chief consisted of three witnesses, whose testimony, while relatively brief, "had some importance to the defense," including "information not otherwise available to the jury."  *Id.*  As a result, we concluded that the "failure to renew [the] motion at the close of all the evidence was not a mere technicality," but rather "[t]he trial judge should have been given an opportunity to consider whether submission of the case to the jury was appropriate in the light of *all* the evidence."  *Id.* (emphasis in original).

In this case, like the ones cited above, Winters moved for judgment as a matter of law at the end of the Appellees' case-in-chief and after the jury verdict, but neglected to do so at the close of all the evidence.  Thus, the issue before us is whether the district court correctly held that Winters's case does not fall within the recognized *Riverview* exception.  In his brief, Winters asserts that he should be able to take advantage of the exception because "the evidence following [his] motion for a directed verdict [after the Appellees' case-in-chief] was 'brief and inconsequential.'"  Appellant's Br. at 55.  We disagree.

First, as in *Jackson*, the district court neither took Winters's motion for judgment as a matter of law under advisement nor signaled that Winters need not renew it at the close of the evidence, but rather explicitly denied it.  The district court ruled that it was "not in a position to direct a verdict related to the factual issues."  Trial Tr. Vol. IV at 31.  Following the denial of the motion, Winters presented two additional witnesses, James Scott Crawford ("Crawford") and Bernard Lorenz ("Lorenz").[16]  Crawford, a certified public accountant employed by MMGI, testified regarding his

---

[15]In his brief, Winters criticized the district court's reliance on an unpublished case of this court.  Appellant's Br. at 57.  We have stated that "[u]npublished opinions of this Court are not binding authority, but nevertheless can be persuasive authority."  *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 205 n.3 (6th Cir. 2004).  The district court did not rely on *Jackson* as precedential but rather used it as guidance for when the *Riverview* exception does not apply.  Given the absence of published cases on that issue, we conclude that this use of the *Jackson* case was appropriate.

[16]Because many of the witnesses were from outside the area and were sought for testimony by both sides in this case, the district court permitted direct examination of the same witness by Appellees and Winters consecutively, rather than adhering to the traditional presentation of plaintiff's entire case followed by the opponent recalling the same witness for his case.  *See, e.g.*, J.A. at 833 (Peebles Trial Tr. Vol. I at 205) (instructing the jury that "the defendant [will have] an opportunity to present what it would about this witness as part of the defense case even though we're technically

role in preparing the fourth quarter IRR. Specifically, he testified as to how the compensation expense was calculated as well as his efforts to obtain information from A+ Homecare regarding compensation expense. Lorenz, who is a certified public accountant with over twenty-nine years in the home care industry and who specializes in home health care reimbursement, was called as an expert witness in the case. He testified that in his opinion Winters "properly accrued and reported deferred compensation costs for the [MMGI] deferred compensation plan on the [THHS] interim rate report for the fourth quarter of the 1993 fiscal year, and [the] [THHS] cost report for the 1993 fiscal year." J.A. at 627-28 (Lorenz Trial Tr. Vol. IV at 74-75). After their direct examinations, each witness was cross-examined by the Appellees.

Although the combined testimony of these witnesses did not cover an expansive amount of time, the testimony, especially that of Lorenz, strikes us as critical to Winters's case, and therefore cannot be characterized as cumulative or inconsequential. Lorenz testified that in his expert opinion, Winters complied with all Medicare regulations. If found credible, Lorenz's opinion could form the basis for finding Winters not liable. Because the trial judge should have been given an opportunity to consider whether to submit the case to the jury in light of all the evidence, including the testimony of Lorenz and Crawford, we conclude that the *Riverview* exception does not apply. Therefore, under our established precedent, Winters waived his right to file a renewed motion because he failed to make a motion for a judgment as a matter of law at the close of all the evidence.

## D. Denial of Motion for a New Trial

The fourth and final issue raised on appeal is that the district court erred in denying Winters's motion for a new trial. We review the "denial of a motion for a new trial under an abuse of discretion standard." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Id.* (internal quotation omitted). Winters's motion for a new trial rests on three grounds: (1) whether the liability finding was against the clear weight of the evidence; (2) whether the damages award was supported by the evidence; and (3) whether a new trial should be awarded because of juror confusion. We will review each of these issues in turn.

### 1. Liability Finding

The first issue which Winters raises in his appeal of the denial of his motion for a new trial is that the jury's finding that he was liable under the FCA was against the clear weight of the evidence.[17] We have held that:

---

still in the government's part").

[17] Appellees argue that Winters should not be able to challenge the sufficiency of the evidence through an appeal of the denial of his motion for a new trial because of his failure to move for judgment as a matter of law at the close of all of the evidence. Appellees' Br. at 31. We have stated that "a party who has failed to move for a directed verdict at the close of all the evidence[] can neither ask the district court to rule on the legal sufficiency of the evidence supporting a verdict for his opponent nor raise the question on appeal." *Portage II*, 899 F.2d at 1522. This principle holds whether the basis for challenging the legal sufficiency of the evidence is a motion for a judgment as a matter of law or a motion for a new trial. *See S. Ry. Co. v. Miller*, 285 F.2d 202, 206 (6th Cir. 1960) ("No motion for directed verdict having been made, the question of the sufficiency of the evidence to support the jury's verdict is not available as a ground for a motion for new trial."). Where the basis for a new trial motion is not the legal sufficiency of the evidence, however, but "that the verdict of the jury was against the great weight of the evidence, the applicable rule is that such a contention is addressed to the discretion of the trial judge." *Id.* Though the language in Winters's brief is not entirely consistent upon this point, we will review his motion for a new trial on the grounds that the verdict was against the clear weight of the evidence.

> A court may set aside a verdict and grant a new trial when it is of the opinion that the verdict is against the clear weight of the evidence; however, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable. Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper.

*Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820-21 (6th Cir. 2000) (internal quotations omitted). Applying the standard to this case, we conclude that the district court did not abuse its discretion in denying Winters's motion for a new trial.

### a. The IRR

Winters's first argument with regards to his motion for a new trial is that no evidence was presented for a reasonable jury to find him liable based on the pension accrual included in the fourth quarter IRR. The FCA states that:

> Any person who —
>     (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;
>     (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]
>     . . .
>     (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729. Thus, the FCA imposes liability when (1) a person presents a claim for payment or approval or to decrease an obligation owed to the Government; (2) the claim is false or fraudulent; and (3) the person acted knowingly, defined as actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). On appeal, Winters does not contest that filing the IRR with Palmetto was a claim for payment or to decrease an obligation, but rather challenges the jury's verdict on the latter two grounds. Specifically, Winters argues that no reasonable juror could find that the pension accrual on the IRR was false or that it was knowingly false, and therefore that he is entitled to a new trial. We disagree.

At trial, the Government presented substantial evidence indicating that Winters had knowingly included a false or fraudulent pension expense in the IRR. First, the Government presented evidence indicating that Winters had not signed the THHS board minutes until October 1995, which meant that THHS had not formally adopted the MMGI Plan during FY93. *See supra* note 1. By its own terms, the Plan required an affiliated employer to adopt the Plan in writing before its employees became eligible to receive benefits. J.A. at 1186, 1243 (MMGI Plan at 4 § 1.13, 61 § 10.1). Therefore, THHS could not contribute in 1993 to a pension plan it failed to adopt until 1995. A reasonable jury could find that including this pension accrual on the fourth quarter IRR for reimbursement by Medicare was a false claim.

Second, Winters testified that he directed Ruffin to include a pension contribution in the IRR by calculating 15% of total salary expense on Holloway's draft IRR, or $527,019.30. J.A. at 974

(Winters Trial Tr. Vol. I at 69). Holloway testified, however, that the salary expense on her draft IRR included several branches that were part of THHS during FY93 but were transferred out before Winters acquired the company. Holloway also explained at trial that the total number of employees at THHS fell from approximately four hundred in the beginning of 1993 to fifty-seven by June 1993. Therefore, the salary expense on her draft IRR included more than three hundred employees who were no longer part of THHS and thus not eligible to participate in the Plan.[18] Because Medicare only reimburses providers for pension contributions which are actually allocated to employees, a reasonable jury could conclude that a pension accrual calculated for employees who are no longer employed at THHS and who were never eligible to participate in the Plan is a false claim.

Third, there is substantial evidence in the record that Winters *knowingly* included the false claim in the IRR. Holloway testified that she met with Winters "to make sure that Mr. Winters understood the number of branches that were part of [THHS] at the time that he was contemplating purchasing [THHS]." J.A. at 598 (Holloway Trial Tr. Vol. II at 169). She explained that "[t]he crux of my conversation with Mr. Winters was to make sure he understood that the visits would decrease and that some of the branches that have been reporting under [THHS] would no longer be reporting." J.A. at 600 (Holloway Trial Tr. Vol. II at 171). Winters testified that he was aware that THHS had approximately fifty-seven employees at the time he purchased the company. J.A. at 968 (Winters Trial Tr. Vol. I at 63). Moreover, he also stated that he was familiar with Medicare regulations and knew that only THHS employees could participate in the Plan. J.A. at 992-93 (Winters Trial Tr. Vol. I at 87-88). Nevertheless, Winters instructed Ruffin to use Holloway's total compensation expense for FY93 to calculate the pension contribution of $527,019.30 for THHS's fifty-seven employees. A reasonable jury could find that Winters had actual knowledge that the accrual was false.

In sum, we hold that a reasonable jury could find that the pension accrual of $527,019.30 on the fourth quarter IRR was a false claim and that Winters had actual knowledge of its falsity. Therefore, we conclude the district court did not abuse its discretion in denying Winters's motion for a new trial on Count I.

### b. The Cost Report

Winters's second argument with regards to his motion for a new trial is that no evidence was presented for a reasonable jury to find him liable based on the pension accrual included in the final Cost Report. Echoing his arguments above, Winters claims that no evidence was presented that the accrual on the Cost Report was a false claim or that it was knowingly false, and therefore that he is entitled to a new trial. Once again, we disagree.

The Government presented substantial evidence indicating that Winters had knowingly included a false or fraudulent pension expense in the final Cost Report. First, as we stated above, the Government presented evidence indicating that Winters had not signed the THHS board minutes

---

[18]To participate in the Plan, an eligible employee must have completed a year of service during the Plan year and must be actively employed on the last day of the Plan year. J.A. at 1208 (MMGI Plan at 26 § 4.3(b)). Winters argued repeatedly at trial about the distinction between a contribution and participation/allocation. J.A. at 1049 (Winters Trial Tr. Vol. I at 144). The Plan explicitly states that the size of the contribution to the Plan "shall be determined by the Employer." J.A. at 1207 (MMGI Plan at 25 § 4.1(a)). Medicare will not reimburse for any size contribution, however, but rather only for "the reasonable cost of services covered under Medicare and related to the care of beneficiaries." 42 C.F.R. § 413.9(a). "Reasonable cost includes all necessary and proper expenses incurred in furnishing services." 42 C.F.R. § 413.9(c)(3). James Peebles ("Peebles"), an audit manager at Palmetto, testified that Medicare only reimburses a pension contribution to the extent that it is actually allocated to the employees. J.A. at 819 (Peebles Trial Tr. Vol. I at 191). Therefore, to calculate a reasonable pension expense, it is appropriate to determine how much could be allocated to participating eligible employees. Winters seemed to concede this point grudgingly in his trial testimony. *See* J.A. at 1039-43 (Winters Trial Tr. Vol. I at 134-38).

until October 1995. Thus, a reasonable jury could find that THHS could not contribute for calendar year 1992 to a pension plan that it failed to adopt until 1995. Moreover, the minutes for the board of directors meeting at which THHS purportedly adopted the Plan state that the version of the Plan adopted is the amended one which became effective January 1, 1993. J.A. at 1278 (THHS Minutes). Therefore, THHS was not an affiliated employer in the prior version of the Plan and could not make a contribution to the Plan for calendar year 1992.

Second, Winters instructed Hayden to calculate the compensation expense for calendar year 1992 based on state unemployment tax information for A+ Homecare and HCA. After compiling the tax information, Hayden created two schedules: one with 397 people and another with 130. The distinction between the two schedules was that the second one excluded compensation expense for employees who were not still working at THHS in the first quarter of 1993. The second schedule was created in an attempt to conform with the Plan requirements that an eligible employee must work for a year and be employed on the last day of the Plan year to participate in the allocation of the contribution.[19] Peebles, an audit manager at Palmetto, testified that Medicare only reimburses a pension contribution to the extent that it is actually allocated to the employees. J.A. at 819 (Peebles Trial Tr. Vol. I at 191). Despite that fact, Winters instructed Hayden to calculate the pension expense for the Cost Report based on "the schedule with the most employees." J.A. at 929 (Schwab Trial Tr. Vol. III at 178). Therefore, Hayden calculated the pension contribution as 15% of the compensation expense in the first schedule, and thus THHS reported a pension contribution of $620,952.39 in the Cost Report. A reasonable jury could find that, by presenting the pension accrual to Palmetto without taking steps to ensure that the employees were actually eligible to participate in the Plan, Winters filed a false claim.

Moreover, reliance on either of these schedules to calculate the pension expense was problematic. There was no way to determine if the employees were actually working for THHS or instead for one of the other home health agencies or branches owned by HCA or A+ Homecare or for their respective home offices. Holloway testified that many of the people listed on Hayden's schedule never worked for THHS. J.A. at 617-18 (Holloway Trial Tr. Vol. II at 188-89). Carney testified that had he been told "that they were employees that did not provide services for [THHS] and, therefore, were not [THHS] employees, [he] would not have said that they be included in the computation included with [THHS]." J.A. at 354 (Carney Trial Tr. Vol. III at 216). Hayden testified at trial that he told Winters "we couldn't confirm which employees were from which company." J.A. at 556 (Hayden Trial Tr. Vol. III at 131). Nevertheless, Winters instructed Hayden to use the larger number in the Cost Report.

In addition, even though the Cost Report was filed two years after the end of FY93, Winters had failed actually to make a contribution to the Plan. Though it had accrued a pension expense of $527,019.30 on the fourth quarter IRR in August of 1993, THHS had yet to make any contribution by October 1995 despite the fact that it had received money from the Medicare Trust Fund in 1993 for that pension expense and that Medicare regulations required the contribution to be funded within one year of the accrual. In the final Cost Report for FY93, which was filed in October 1995, THHS increased the pension accrual to $620,952.39. A reasonable jury could conclude that because THHS had not even begun to pay the pension expense accrued on the fourth quarter IRR, Winters had no

---

[19]It should be noted that though the second schedule attempted to conform with the Plan, Hayden could not actually verify if the employees met the Plan requirements for participation. Hayden informed Winters that "[he] had no way to determine whether anyone worked 1,000 hours and met this 1,000 hour working requirement. [He] did not have any information that would definitely ascertain whether someone met the end of the year working requirement." J.A. at 555 (Hayden Trial Tr. Vol. III at 130). By instructing Hayden to use the first schedule, however, Winters did not even attempt to abide by the Plan requirements.

intention ever to contribute to the Plan, and thus the pension accrual on the Cost Report was another false claim.[20]

Winters argues that even if the accrual was false, there is no evidence for a reasonable jury to find that he had knowledge of its falsity, but rather his reliance on the advice of counsel and skilled employees precludes a finding of actual knowledge. Appellant's Br. at 49. The record reveals, however, that though many aided in the calculation of the pension accrual, Winters's key advisors warned him against making a contribution to the Plan in FY93. The accrual on the Cost Report was a result of advice from Carney, MMGI's outside pension attorney, who informed Winters that any contribution in FY93 should be calculated for calendar year 1992. Carney advised Winters as early as 1993, however, against making a pension contribution in FY93 because "there was no information available to determine who are eligible and ineligible employees, so you cannot make that calculation to know what to contribute to the plan." J.A. at 363 (Carney Trial Tr. Vol. III at 225). In 1995, while preparing the Cost Report, Carney advised Winters that "[t]here was no way to fund it because we could not calculate the funding. So my advice to him is you can't fund it until you calculate what you put into it." J.A. at 363 (Carney Trial Tr. Vol. III at 225).

Hayden, the MMGI employee who actually calculated the pension contribution for the Cost Report, testified that he informed Winters "we couldn't confirm which employees were from which company." J.A. at 556 (Hayden Trial Tr. Vol. III at 131). He also informed Winters that "[he] had no way to determine whether anyone worked 1,000 hours and met this 1,000 hour working requirement. [He] did not have any information that would definitely ascertain whether someone met the end of the year working requirement." J.A. at 555 (Hayden Trial Tr. Vol. III at 130). Hayden also told Winters that he "could not determine which schedule was more accurate." J.A. at 929 (Schwab Trial Tr. Vol. III at 178). Despite the fact that THHS was not required to make any pension contribution in FY93, Winters included the accrual in the Cost Report against the recommendation of his advisors. Therefore, a reasonable jury could find that Winters had actual knowledge of the falsity, or at least reckless disregard for the truth.[21]

---

[20]The district court also ruled that there was sufficient evidence for a reasonable jury to find that Winters submitted a false claim under the "implied certification" theory. In *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002), we adopted the "implied certification" theory, which holds a defendant liable for violating the "continuing duty to comply with the regulations on which payment is conditioned." In *Augustine*, the defendants filed Medicare cost reports, which were not false or fraudulent at the time they were submitted, but became so subsequent to the filing when the defendants withdrew money from the ESOP to use for other uses. *Id.* We concluded that the defendants were liable for failing to file amended cost reports, and thereby violating their continuing duty to comply with Medicare regulations. *Id.* In this case, we need not reach the issue of Winters's liability under an "implied certification" theory, because we conclude that a reasonable jury could find that the Cost Report was false or fraudulent at the time it was submitted to Palmetto.

[21]Winters further argues in his brief that a reasonable jury could not find that the accrual was knowingly false because he included several disclaimers along with the Cost Report explaining that the information was based on "best available information." Appellant's Br. at 49. Winters cites two cases from other circuits in support of the argument that the Government's knowledge of the accrual precludes a finding that he knowingly submitted a false claim. In both of the cited cases, however, the court of appeals held that the Government's knowledge is relevant but not necessarily dispositive of the issue of knowledge.
   The Second Circuit stated that "the statutory basis for an FCA claim is the defendant's knowledge of the falsity of its claim, which is not automatically exonerated by any overlapping knowledge [of] government officials." *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156 (2d Cir.), *cert. denied*, 508 U.S. 973 (1993). Government knowledge may be relevant however, to "show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'" *Id.* at 1157. Similarly, the Ninth Circuit has stated "[t]hat a defendant has disclosed all the underlying facts to the government may . . . show that the defendant had no intent to deceive. But what constitutes the offense is not intent to deceive but knowing presentation of a claim that is either 'fraudulent' or simply 'false.'" *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991). The court explained that the Government's knowledge is relevant if the defendant "did merely what the [Government] bid it [to] do, that the [defendant] had no knowledge that the contract was based on

In sum, we hold that a reasonable jury could find that the pension accrual of $620,952.39. on the final Cost Report was a false claim and that Winters had actual knowledge of its falsity. Therefore, we conclude the district court did not abuse its discretion in denying Winters's motion for a new trial on Count II.

### 2. Damages Award

The second issue which Winters raises in his appeal of the denial of his motion for a new trial is that the damages award was against the clear weight of the evidence. Under the FCA, a person who knowingly presents a false claim for payment or approval or to decrease an obligation owed to the Government "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act." 31 U.S.C. § 3729(a). At the request of the Government, the district court remitted the jury award of $1,061,138.80, to $602,565.43 to reflect the actual damages incurred, then trebled that amount to $1,807,696.29 consistent with the statute. The $602,565.43 value represents the pension accrual on the Cost Report attributable to Medicare. Winters argues on appeal that any damage sustained by the Government was directly a result of Palmetto's failure to issue a notice of provider reimbursement ("NPR"), rather than the result of the pension accrual on the Cost Report, and therefore he should be entitled to a new trial. We disagree.

Under the Medicare regulatory regime, service providers are paid for "the reasonable cost of services furnished to beneficiaries" through "interim payments approximating the actual costs of the provider." 42 C.F.R. § 413.64(a). The cost report filed at the end of the year allows for retroactive adjustment based on the actual costs incurred. 42 C.F.R. § 413.64(f). The regulations require that within a reasonable time after receipt of the cost report, the fiscal intermediary must issue the provider "a written notice reflecting the intermediary's determination of the total amount of reimbursement due the provider," which is known as the NPR. 42 C.F.R. § 405.1803(a). The NPR provides the basis for making any retroactive adjustments, including recoupments for overpayments made during the year. 42 C.F.R. § 405.1803(c).

In this case, the fourth quarter IRR included a pension accrual of $527,019.30 for the THHS employees to the MMGI Plan, of which $520,051.00 was attributable to Medicare. As a result of the filing of the IRR, THHS did not have to repay Medicare $205,466.00, and received a payment from Medicare of $314,585.00. The final Cost Report, which was filed in October 1995, contained a revised pension accrual of $620,952.39, of which $602,565.43 was attributable to Medicare. After the higher pension contribution was added to the rest of the expenses on the Cost Report, THHS owed Medicare $71,839.00 for FY93. If the pension accrual was not included in the Cost Report, the amount owed to Medicare would have increased by the amount of the reimbursable expense, or $602,565.43. Thus, THHS would have had to repay Medicare a total of $674,404.43. Palmetto disallowed the pension expense, but never issued an NPR. Peebles testified that in a situation where fraud might be involved, Palmetto delays the issuance of the NPR. J.A. at 891 (Peebles Trial Tr. Vol. I at 58). Because the NPR was never issued, THHS never repaid the pension amount. Thus,

---

. . . false information." *Id.*

Both of these cases involved situations in which the Government's knowledge was used to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement with the Government. By contrast, in this case, there is no evidence that Palmetto had altered the understanding of what kind of expenses could be reimbursed under the Medicare regulations. Moreover, though Winters attached letters explaining that the pension accrual was based on "best available information," he neglected to disclose all the pertinent information: that it was based on calendar year 1992, at which time he did not own THHS; that it was based on compensation expense for employees who were not eligible to participate in the Plan; that it was based on compensation expense for employees who may not have even worked at THHS; and that the Plan was not adopted by THHS in FY93. Therefore, we conclude that Winters's argument that liability is precluded by the Government's knowledge is unpersuasive.

the total damages which resulted from the fraudulent claims on both the IRR and the Cost Report were $602,565.43.

Winters argues that had Palmetto simply issued the NPR, THHS would have repaid the pension expense and the Government would not have incurred any damages. While the argument is logical, it misconstrues the issue in this case. Medicare regulations establish the NPR as an administrative mechanism to make "necessary adjustments due to previously made overpayments or underpayments" not as a remedial mechanism for fraud. 42 C.F.R. § 413.64(f)(1). The FCA is the exclusive remedy provided by Congress to recover for fraudulent claims made against the Government. As the United States Supreme Court has stated, in enacting the FCA, "Congress wrote expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation omitted). The damages provision in the FCA reflects Congress's view "that some liability beyond the amount of the fraud is usually necessary to compensate the Government completely for the costs, delays and inconveniences occasioned by fraudulent claims." *Id.* at 130 (quotation omitted). Moreover, the treble damages provision ensures not only full compensation, but also the fundamental integrity of all those who seek to do business with the Government. *See Midwest Specialities*, 142 F.3d at 302 (noting the purpose of the FCA is to effect "the maxim that [m]en must turn square corners when they deal with the Government"). To accept Winters's theory would be to carve out fraudulent Medicare claims from the broad scope of the FCA. According to Winters's argument, the remedy for fraudulent claims made on Medicare cost reports would be limited to the disallowance of those claims by the fiscal intermediary and the simple repayment of those claims pursuant to an NPR. If such a Medicare carve-out is necessary, it is the province of Congress to create it.

Therefore, we conclude that a jury could reasonably find that as a result of Winters's fraudulent pension expense, the United States suffered damages of $602,565.43. Thus, the district court did not abuse its discretion in denying Winters's motion for a new trial on the issue of damages.

### 3. Juror Confusion

The final issue which Winters raises in his appeal is that he should be entitled to a new trial because the jury was in a state of confusion, demonstrated by the fact that it awarded $1,061,138.80 in damages to the Government. We have held that a district court "may grant a new trial under Rule 59 . . . if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise [was] unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). We have also noted, however, that "where verdicts in the same case are inconsistent on their faces, indicating that the jury was either in a state of confusion or abused its power, a motion to alter or amend a judgment, for new trial . . . if timely made, is not discretionary." *Hopkins v. Coen*, 431 F.2d 1055, 1059 (6th Cir. 1970). Winters relies on our holding in *Hopkins* to argue that the district court abused its discretion in denying his motion for a new trial. Because there was no inconsistency between the verdict and the damages award, we conclude the district court did not abuse its discretion by remitting the award and denying Winters's motion for a new trial.

During its closing argument, the Government argued that the maximum amount which could be awarded under Count I was $520,051.00; the maximum amount that could be awarded under Count II was $602,565.43; and if the jury found liability under both counts, the appropriate award would still be $602,565.43. J.A. at 1101 (Trial Tr. Vol. V at 41). As the Appellees explain in their brief, the damages under Count I are subsumed by the damages under Count II. Appellees' Br. at 41. During deliberations, the jury sent two questions to the judge asking: (1) how the Government arrived at the $602,565.43 figure as the total damages; and (2) how did that figure relate to the pension accruals of $527,019.30 on the IRR and $620,952.39 on the Cost Report? Trial Tr. Vol. V

at 163. The district court did not answer the questions, but rather advised the jury to review all the evidence. After deliberating further, the jury found Winters liable on all counts and awarded damages in the amount of $1,061,138.80. The district court polled the jurors individually, each of whom agreed with the result. Following the dismissal of the jury, the Government asked the district court to remit the jury award to the amount it requested, $602,565.43.

Winters argues that, pursuant to our holding in *Hopkins*, there was evidence of jury confusion, and therefore the district court should have awarded a new trial. In *Hopkins*, the jury was given verdict forms which reflected all the possible outcomes of the trial. 431 F.2d at 1057. After deliberations, the jury signed all the verdict forms, thereby finding in favor of the plaintiff and awarding $75,000, and against the plaintiff and in favor of the defendant on the same count. *Id.* at 1058. We held that the forms "indicate a general state of confusion on the part of the jury," and therefore a new trial was required. *Id.* at 1059. Critical to our reasoning was the fact that there was no discernible outcome to the trial. By contrast, in this case, the verdict was completely consistent with the damages award. The jury was not confused as to Winters's liability under the FCA, but rather miscalculated the extent of the harm to the Government. Therefore, we conclude that *Hopkins* does not apply.

Moreover, whatever error was caused by the jury's miscalculation was cured by the district court's remittitur. We have stated that "[a] remittitur is proper where the judge finds the damages awarded excessive." *Mitroff v. Xomox Corp.*, 797 F.2d 271, 279 (6th Cir. 1986).

> The practice [of remittitur] has come to be employed in two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken; and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984) (internal citations omitted). When it orders a remittitur, the court should "confine its role to the removal of the excess portion of the verdict so that the damage calculation leaves in the judgment a portion of what the jury awarded." *Id.* (internal quotation omitted). As the Supreme Court has stated, "the remittitur has the effect of merely lopping off an excrescence." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

In this case, while its not entirely clear how it calculated the award of damages,[22] the jury clearly found Winters liable on both Counts I and II. Liability on each count directly translated to a quantifiable value of damages. Therefore, the appropriate damages award for a finding of liability on both counts is $602,565.43. The district court did not err by lopping off the excrescence. Thus,

---

[22] Winters argues that because one of the jury instructions, to which he failed to object at trial, contained the treble damages provision of the FCA, the damages award may have reflected a treble amount. Appellant's Br. at 60-61. We find this argument wholly unpersuasive. First, there is no evidence in the record to support the argument that the jury believed that it was awarding treble damages. Second, the jury award of $1,061,138.80 is not divisible by three, but rather results in $353,712.93 with a repeating remainder. Third, the $353,712.93 value has no support in the record. The more plausible explanation is that the jury award does not reflect that the damages from Count I are subsumed by the damages from Count II. The jury most likely added the pension accrual from the IRR to the pension accrual on the Cost Report and then deducted approximately $86,000 to reflect the actual allocation made to THHS employees during calendar year 1993. *See* J.A. at 465 (Ellis Trial Tr. Vol. III at 83). The Government referenced the $86,000 value in its closing argument. Trial Tr. Vol. V at 35. In any event, we decline Winters's request to delve into the jury's reasoning in an attempt to find potential error. *See Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.) ("Courts may not reach behind jury verdicts to evaluate their reasoning."), *cert. denied*, 528 U.S. 966 (1999). The case presented to the jury was complex and involved hundreds of exhibits including several financial analyses. That the jury miscalculated the award does not alter the fact that it found Winters liable on both counts, and therefore the appropriate damage award was the one remitted by the court.

we conclude the district court did not abuse its discretion in denying Winters's motion for a new trial because of jury confusion.

## III.  CONCLUSION

For the foregoing reasons, we conclude that the district court did not err on any of the issues raised on appeal, and thus the jury verdict and the remitted award of damages is **AFFIRMED**.